UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RONGELETTA HUDSON | ) | CASE NO.  1:15CV31 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Rongeletta Hudson Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his September 17, 2013 decision in finding that Plaintiff was not disabled because she could perform jobs in significant numbers in the national economy (Tr. 44-65).  The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I.    PROCEDURAL HISTORY

In 2007, Plaintiff applied for DIB and SSI on the basis of disability, but an ALJ found that she was not disabled after the state agency that makes disability determinations for the Commissioner reached the same conclusion initially and on reconsideration (Tr. 117, 136).  The Appeals Council denied review, rendering the ALJ's decision (which adjudicated the time period between Plaintiff's alleged onset of disability on April 2, 2007 and the date of the decision, June 10, 2011) the final

1

decision of the Commissioner on Plaintiff's 2007 application (Tr. 141). The 2007 application is not before this Court.

Plaintiff filed new applications for DIB and SSI in December 2011 and January 2012 (Tr. 47). To be eligible for DIB, she needed to show that she became disabled no later than September 30, 2011 (Tr. 48). After Plaintiff's application was twice denied by the state agency based on its application of the *Drummond* doctrine (Tr. 155. 202), she requested a hearing before an administrative law judge (ALJ) (Tr. 104). At that hearing, Plaintiff (who was represented by counsel) and a vocational expert testified (Tr. 66-102).

Following the hearing, the ALJ issued a decision denying Plaintiff's applications after he concluded that no new and material evidence existed that would justify a departure from the prior ALJ's findings under the *Drummond* doctrine (Tr. 47-48). The ALJ concluded that Plaintiff had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. Section 404.1567(b) with the following limitations: "no climbing of ladders, ropes or scaffolds; occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling; no exposure to hazards including heights, machinery, or commercial driving" (Tr. 59; *cf.* Tr. 125-126 (prior decision)). The ALJ also identified mental limitations, finding that Plaintiff could only "perform work in a low stress environment (no fast pace, strict quotas or frequent duty charges" that involved only "superficial interpersonal interactions (that is, no negotiation, confrontation, arbitration, supervision of others, or being responsible for the health, safety and welfare of others)" (Tr. 53, *cf.* Tr. 126 (prior decision)).

Based upon the testimony of a vocational expert, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Plaintiff could] perform" (Tr. 59). The ALJ's decision became the Commissioner's final decision in Plaintiff's case after the Appeals Council

denied review (Tr. 1-4). Plaintiff filed this judicial action challenging the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g) and 1383(c).

## II.     STATEMENT OF FACTS

Plaintiff was born on November 11, 1969, which made her forty-one years old as of her alleged onset date. Plaintiff has a high school education and was found by the ALJ to have past relevant work experience as a research assistant II, loan specialist, mortgage loan closing clerk, program manager, and office manager (Tr. 58, 72).

## III.    SUMMARY OF MEDICAL EVIDENCE

Plaintiff was hospitalized in July 2011 due to hepatitis associated with a lupus flare; her last prior hospitalization had been in 2007 (Tr. 54, 419-443). In December 2011, she was hospitalized due to anemia and pancytopenia caused by a medication that she had recently begun to take (Tr. 444-483). In April 2012, Plaintiff went to the emergency room, complaining of intermittent chest pain, shortness of breath, and fatigue (Tr. 539). She characterized her pain as "mild," and stated that the last time she had been fatigued, her hemoglobin and hemocrit were low (Tr. 439). Bloodwork, an x-ray, an EKG, and a physical examination were all normal, except for a slightly elevated amylase (i.e., pancreas hormone) level (Tr. 639-640). Plaintiff did not require treatment, and was discharged with diagnoses of "noncardiac chest pain" and "fatigue" (Tr. 640).

Plaintiff was hospitalized for a few days in September 2012, after presenting to the emergency room "with chest and abdominal pain on and off for the last several months" (Tr. 653). Review of systems was negative, except for Plaintiff's complaints of shortness of breath and chest pain, while a physical examination conducted after she received medication did not reveal any abnormalities (Tr.

3

653-654). Toxicology reports were positive for cocaine and marijuana (Tr. 664). Discharge diagnoses were gastritis, atypical chest pain versus cocaine-induced chest pain, lupus, and polysubstance abuse (Tr. 654). In January 2013, Plaintiff went to the emergency room with flu symptoms (Tr. 741-742). In May 2013, she was hospitalized for a few days after presenting with a "1-week history of abdominal pain, nausea, and vomiting" (Tr. 869). She "responded rapidly to conservative treatment," and no evidence was found of gastritis, duodenitis, or lupus-related vasculitis (Tr. 869). It was determined that Plaintiff's symptoms were probably caused by CellCept, a medication she was taking, so that medication was discontinued (Tr. 869).

Plaintiff saw a cardiologist in 2012, after testing revealed that she had a mildly reduced ejection fraction (Tr. 755). The cardiologist wrote that Plaintiff's condition had improved greatly since her anemia was corrected in late 2011, prescribed medication, and observed that she described no exertional limitations or true shortness of breath (Tr. 750, 752, 755). He recorded Plaintiff's statement that she experienced some fatigue, but not an excessive amount that interfered with her functioning (Tr. 748). Later in 2012, Plaintiff's ejection fraction was normal (Tr. 672).

Plaintiff saw a gastroenterologist for hepatitis and abdominal pain. In April 2013, she complained of "some epigastric pain along with nausea and occasional vomiting going on since September of 2012" (Tr. 721). The gastroenterologist noted that she had developed some diarrhea on CellCept, but had been doing well with a reduced dose (Tr. 721). On follow-up, Plaintiff reported experiencing "some abdominal discomfort at times but no real abdominal pain," with improvement after taking medication for functional dyspepsia (Tr. 843).

In February 2012, Plaintiff saw Dr. Palfreyman, a rheumatologist, who filled out opinion forms indicating that she had extremely severe physical and mental limitations (Tr. 575-579). He ascribed the physical limitations to her "[h]istory of" lupus, but did not specify the basis for the mental

4

limitations (Tr. 576-579). On the same day, Dr. Palfreyman conducted a physical examination, in which he found that Plaintiff had no swollen or tender joints, and characterized her lupus as "clinically stable" (Tr. 575). There do not appear to be other treatment records from Dr. Palfreyman in the record. Plaintiff also saw a different rheumatologist in 2013; her condition was described as seeming to be "stable with normal CRP, ESR, C3, C4 in 3/13 and 5/13, and no evidence of active lupus on exam" (Tr. 874).

Thereafter, Plaintiff submitted additional evidence to the Appeals Council (Tr. 15-39, 901-942). However, the Sixth Circuit "had repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review," *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001), and Plaintiff has not alleged that this evidence would justify a remand under sentence six of 42 U.S.C. Section 405(g).

## IV. SUMMARY OF TESTIMONY

At the hearing, Plaintiff, who was represented by counsel, and a vocational expert testified (Tr. 66-102). Plaintiff testified that her fatigue, pain and swelling cause her to be unable to work (Tr. 73). She stated that she had pain in her ankles, chest, hands, knees, wrist, and toes, which ranges from an 8-10 out of 10 in severity, and travels throughout her body (Tr. 73-74, 76). Further, she stated she had swelling in her fingers and toes, which lasts three to four hours a day and "weans out as the day goes" (Tr. 73). Plaintiff testified that her lupus causes her hair to fall out, and is worsened by stress (Tr. 75, 84). Plaintiff testified that medications help her pain and swelling, but cause side effects, such as a twenty to thirty pound weight gain, throwing up, trouble sleeping, irritability, anxiety, and depression (Tr. 71, 75).

Plaintiff testified that she can walk for ten to fifteen minutes, stand ten to fifteen minutes, sit thirty to forty minutes, and lift about fifteen pounds (Tr. 77). In addition, Plaintiff stated that she has problems with crowds of ten people or more, has shortness of breath, needs help getting in the shower, and has difficulty using her fingers (Tr. 78-80, 83).

Thereafter, a vocational expert testified. Based upon this testimony, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Plaintiff could] perform," including the positions of cafeteria attendant, inspector/hand packager, assembler, data exam clerk, compiler, and sorter as identified by the vocational expert (Tr. 59). At least 5,000 positions in each of these jobs existed in Ohio (Tr. 59).

## V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits and supplemental security income. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

6

> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id.,*

*Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## VII. ANALYSIS

Plaintiff asserts two assignments of error:

A. WHETHER THE ALJ ERRED BY FINDING THAT THERE WAS NOT NEW AND MATERIAL EVIDENCE DEMONSTRATING A WORSENING OF THE PLAINTIFF'S CONDITION AND FUNCTIONING, AND SHOULD NOT HAVE APPLIED *THE DENNARD* AND *DRUMMOND* ACQUIESCENCE RULINGS.

B. WHETHER THE ALJ ERRED IN ASSIGNING LESS THAN CONTROLLING WEIGHT TO THE OPINION OF TREATING PHYSICIAN DR. PALFREYMAN.

1. In regard to the first assignment of error, *Drummond v. Commissioner of Social Security*, 126 F.2d 837, 847 (6th Cir. 1997) and the Commissioner's Acquiescence Ruling 98-4(6) applying the *Drummond* decision requires an ALJ who is "adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim . . . must adopt [a finding of a claimant's residual functional capacity, or any other finding required at a step in the sequential evaluation process for determining disability] from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period" unless an exception applies. Acquiescence Ruling 98-4(6). As relevant here, *Drummond* and the Acquiescence Ruling do not preclude the ALJ from making a finding contrary to the prior ALJ's finding if "there is new and material evidence relating to" the finding in question. *Id.*

Plaintiff alleges that new and material evidence of a disabling condition existed, particularly Dr. Palfreyman's opinion and Plaintiff's reported symptoms. Pl. Br. 9-14. However, the ALJ gave

8

valid reasons for discounting Dr. Palfreyman's conclusory opinion and for declining to credit Plaintiff's testimony, so his conclusion that no new and material evidence existed is supported by substantial evidence.

Dr. Palfreyman's opinion was based on Plaintiff's "[h]istory of SLE" (i.e., lupus) (Tr. 575). The lack of explanation or supporting documentation was good reason for the ALJ to discount the opinion. Nevertheless, the ALJ went further, by noting that the opinion was inconsistent with the treatment note Dr. Palfreyman prepared the same day, which documented no objective abnormalities or laboratory results while referring to Plaintiff's lupus as "clinically stable" (Tr. 56, 575). Inconsistency is also a valid reason to discount a treating source's opinion. The ALJ further determined that the limitations contained in the opinion were not supported by the record as a whole (Tr. 56), which is another reason for discounting a treating source's opinion.

No evidence supporting Dr. Palfreyman's opinions is found in the record. The ALJ explained that the musculoskeletal examination documented by Dr. Palfreyman "revealed no swelling or tenderness of the hands, wrists, knees, shoulder, ankles, or foot" (Tr. 56; *cf.* Tr. 575). The ALJ also noted that x-rays displayed "mild" degenerative changes in Plaintiff's hand and shoulder (Tr. 54), and that various cardiac tests produced unexceptional results (Tr. 54-55). Even when Plaintiff sought treatment in an emergency room in April 2012, the ALJ observed that "the physical examination was unremarkable including the musculoskeletal examination," at which Plaintiff displayed no tenderness and could "move all [her] extremities without limitations or restrictions" (Tr. 55, *cf.* Tr. 675). An EKG and chest x-ray were normal, as was all of Plaintiff's blood work, except for one "slightly elevated" finding (Tr. 55, *cf.* Tr. 675). Likewise, in July 2013, "the musculoskeletal examination show[ed] full range of motion in all extremities" (Tr. 55, *cf.* Tr. 843).

9

Plaintiff relies on a list of diagnoses and subjective complaints, rather than objective clinical or laboratory findings. *See* Pl. Br. 12. The ALJ recognized that Plaintiff had lupus, hepatitis, some degree of fatigue, and two acute hospitalizations linked to medication side effects (Tr. 50, 54, 55). However, a diagnosis alone does not indicate the degree of functional limitations that claimant experiences. Nor is a diagnosis, itself, "objective medical evidence," as defined in" 20 C.F.R. Section 404.1528(b)-(c), which means findings obtained by clinical observational and laboratory techniques that are independent of a claimant's own statements. *See* 20 C.F.R. Section 404.1529(a). Plaintiff also relies on her own statements about her condition, but a claimant's own statements are characterized as "symptoms," not as a form of objective medical evidence. *See* 20 C.F.R. Section 404.1528(a). Furthermore, while Plaintiff relies on evidence of cardiac impairment documented by her cardiologist, Pl. Br. 12, the same cardiologist described a "mild reduction in function that did not cause any exertional limitations (Tr. 750) with symptoms "largely resolved" after Plaintiff's medication-induced anemia was corrected (Tr. 755).

Plaintiff challenges the ALJ's decision to credit the state agency physicians' opinions by characterizing those opinions as "simply apply[ing] *Drummond*." Pl. Br. 13. In order to apply *Drummond* to adopt the prior ALJ's findings as they did (Tr. 155, 202), the physicians concluded that there was no new and material evidence in the record that would justify a departure from the prior ALJ's findings. Thus, the state agency physicians spoke directly to the issue the ALJ had to decide. Furthermore, the cardiac testing upon which Plaintiff relies was in the record at the time the first state-agency physician offered an opinion (Tr. 152), and Dr. Palfreyman's opinion was in the record prior to the rendering of the second state-agency physician's opinion (Tr. 201-202). In conclusion, since the state agency physicians' opinions support the basis of the ALJ's ruling because no new and material evidence existed, the prior ALJ's findings were required to be adopted in accordance with

10

*Drummond.*

The ALJ recognized that Plaintiff experienced some degree of fatigue, but did not credit her testimony that she was "always extremely fatigued" (Tr. 53, 56 (ALJ decision), Tr. 73 (testimony)). Plaintiff does not argue against the finding that Plaintiff lacked the candor regarding her substance abuse as one of the bases for the ALJ's credibility determination based on her statements to a consultative psychologist who was conducting a disability examination in 2012 (Tr. 57, 632). The prior ALJ also concluded that Plaintiff was not forthcoming about her substance use (Tr. 128). Rather, Plaintiff asserts that the ALJ played doctor by relying on "conservative treatment history" without explaining what other medications or treatment were potentially available. Pl. Br. 10. However, in commenting on Plaintiff's treatment history, the ALJ specifically noted that she was not seen frequently by her doctors, and that she did not consistently complain about fatigue, and, therefore, he concluded that these facts suggested that her symptoms were not as severe as she alleged (Tr. 56). The ALJ can consider that a claimant who was experiencing the degree of symptoms alleged by Plaintiff would have sought medical care for her complaints on a more frequent basis.

In response to the ALJ's observation that Plaintiff did not consistently complain of fatigue to her doctors (Tr. 56), Plaintiff suggests that she did consistently complain about fatigue, citing four specific documents – the hearing transcript (Tr. 71), a December 2011 report of shortness of breath of a few weeks' duration that was accompanied by fatigue (Tr. 447), her subjective complaint to Dr. Palfreyman on the day he prepared his opinion (Tr. 575), and an emergency room record from April 2012 (Tr. 639-640). *See* Pl. Br. 11. But this last record undermines Plaintiff's assertion of "always" being fatigued, for – as the ALJ mentioned – it also indicates that the "last time [Plaintiff] was fatigued, her [hemoglobin] and [hemocrit] were low" (Tr. 53, 639). This reference to Plaintiff's hospitalization for anemia and pancytopenia due to a medication side effect in December 2011, five

11

months prior to the emergency room visit, undermines Plaintiff's assertion that she was always extremely fatigued (Tr. 496). Hence, the evidence upon which Plaintiff relies is not inconsistent with the ALJ's finding that her testimony about fatigue lacked support in the reports of her complaints to her doctors.

A review of the record confirms the correctness of the ALJ's finding that Plaintiff did not complain to her doctors about fatigue with regularity. Plaintiff's cardiologist, Dr. Mohan, did not report complaints of fatigue in February 2012, March 2012, or June 2012 (Tr. 749-755). In fact, he wrote in June 2012 that Plaintiff did not appear to have any true shortness of breath or exertional limitation, but linked her functional limitation due to arthritis (Tr. 749). Also, the cardiologist wrote in July 2012 that Plaintiff complained of "a little fatigue, but not excessive fatigue that would limit her functional capacity" (Tr. 748). In addition, her gastroenterlogist did not document any complaints (and wrote that Plaintiff denied any complaints not listed) in August 2011, September 2011, October 2011, February 2012, March 2012, April 2013, and July 2013 (Tr. 744, 776-777, 783-785, 843). At each of these office visits, the gastroenterologist wrote that Plaintiff was "active and alert" (Tr. 744, 776-777, 783-785, 843). Thus, the ALJ did not selectively read the record to find that Plaintiff did not regularly bring her complaints of fatigue to her doctors' attention.

Next, Plaintiff argues that a November 2011 finding that she had a 48% ejection fraction, possibly due to lupus, constituted new and material evidence. Pl. Br. 10. However, the ALJ correctly found that Plaintiff's condition had not materially changed. As he explained, further cardiac testing was unexceptional: Plaintiff's echocardiograms were benign, her cardiologist reported stable examination findings, her chest x-ray was normal, her labs were normal (with one slight elevation), and her complaints of chest pain at the emergency room were described as non-cardiac in one case and potentially cocaine-related in another (Tr. 54-55). Thus, the ALJ correctly found that this data

accurately characterized Plaintiff's cardiac status, particularly in light of the sparse evidence that her condition would have rendered her unable to perform a reduced range of work at the sedentary and light exertional levels. Although one testing record characterizes an ejection fraction over 45% as normal (Tr. 510), her cardiologist identified this as a "mild" reduction – however, one that may have improved in the three months following the test, during which Plaintiff's anemia was corrected and her symptoms largely resolved (Tr. 755). By 2012, Plaintiff's ejection fraction had improved to 60-65% (Tr. 672).

Plaintiff notes that she was hospitalized on two occasions due to side effects from medication. Pl. Br. 11. Since the Act's disability standard required Plaintiff to demonstrate the existence of a condition that was disabling for a consecutive twelve-month period, in accordance with 42 U.S.C. Section 423(d)(1)(A); *see also* 20 C.F.R. Sections 404.1505 and 404.1509, she cannot establish entitlement to benefits by showing that she could not perform substantial gainful activity only in the context of medical conditions that resolved soon after the medication in question was discontinued. Likewise, while Plaintiff was hospitalized in 2011 with evidence of a lupus flare, the ALJ noted that she had not previously had such a flare since 2007, and that this frequency was consistent to the evidence before the previous ALJ, which also reflected one hospitalization associated with a lupus flare over a period of several years (Tr. 54, 131).

While Plaintiff claims that "the ALJ's conclusion [relating to side effects was] clearly in error," she relies on her own hearing testimony to buttress her assertion that she continued to experience disabling side effects even after the medications that resulted in her hospitalizations were discontinued. Pl. Br. 11. However, the ALJ – who heard and saw Plaintiff testify – decided not to credit that testimony, noting that the medical records "fail to show that [Plaintiff' complained with any regularity about side effects from medication to her doctors" (Tr. 56). He also noted that after Plaintiff complained of "occasional vomiting" in April 2013, her gastroenterologist adjusted her medication,

13

and on follow-up (which occurred about two months after the second hospitalization for medication side effects in May 2013), Plaintiff "was having some abdominal discomfort at times but no real abdominal pain" with no abdominal tenderness and good response to medication (Tr. 56).

In addition, the ALJ described the limited evidence related to Plaintiff's mental health, noting that the findings and opinion of a consultative psychologist were consistent with the prior ALJ's RFC finding, and that Plaintiff had not received any mental health treatment (Tr. 56). From these facts, the ALJ inferred that there was no new and material evidence to justify a finding that Plaintiff's mental residual functional capacity had changed from the RFC found by the prior ALJ (Tr. 56) in accordance with *Dennard* and *Drummond* acquiescence rulings.

2. Finally, in regard to the second assignment of error, the treating physician rule requires that ALJs give controlling weight to a treating physician's opinion, rather than favoring the opinions of a non-treating physician, if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence of record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also,* 20 C.F.R. 404.1527(d)(2), (f). Exceptions exist, but only if adequately explained. *Wilson,* 378 F.3d at 544. The Sixth Circuit has stated, "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). In other words, even if an ALJ finds that the opinion of a treating source is not entitled to controlling weight, this finding does not mean the opinion should be rejected. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). Rather, if the ALJ declines to place controlling weight on the opinion of the treating source, the ALJ must then continue to weigh it under a number of factors set forth in the Regulations.

In *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (2013), the Sixth Circuit emphasized that if the treating source opinion is not given controlling weight, the ALJ should then determine the

appropriate weight based off of 20 C.F.R. Section 404.1527(d)(2) (length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source). Additionally, "[i]n articulating good reasons for assigning weight other than controlling, the ALJ must do more than state that the opinion of the treating physician disagrees with the opinion of a non-treatng physician (*Hensley v. Astrue*, 573 F.3d at 206-267 (6th Cir. 2009), or that objective medical evidence does not support that opinion." *Frend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-552 (6th Cir. 2010). In Plaintiff's case, the ALJ correctly utilized the standards set forth in 20 C.F.R. Section 404.1527(d)(2) and gave good reasons for giving less than controlling weight to Dr. Palfreyman.

The ALJ provided "good reasons" for assigning "little weight" to Dr. Palfreyman's medical source statement concerning Plaintiff's physical functioning (Tr. 578-579). The ALJ did more than state that the opinion of the treating physician disagrees with the opinion of a non-treating physician or that objective medical evidence does not support that opinion. *Id.* In the instant case, the ALJ identified good reasons to not give the opinions of Dr. Palfreyman controlling weight.

Dr. Palfreyman supplied a medical source statement concerning Plaintiff's physical functioning that did not support a finding of disability (Tr. 578-579). The ALJ needed good reasons to disregard this opinion. *Rogers, supra*. In his decision, the ALJ correctly gave little weight to the opinions of Dr. Palfreyman (Tr. 56), stating it was not supported by the record as a whole, including the treatment records (Tr. 56).

In addition, there is evidence of record that does not support Dr. Palfreyman's opinions by non-examining physicians, Dr. Sarah Long and Anahi Ortiz dated June 4, 2012 and October 10, 2012, respectively (Tr. 147-170, 173-206). Both Dr. Long and Ortiz correctly applied *Drummond* and adopted the residual functional capacity of the prior ALJ (Tr. 147-170, 173-206). Dr. Palfreyman's

15

opinions are inconsistent with the evidence of record, and, therefore, they are not entitled to great deference.

The ALJ did correctly follow the treating physician rule for assigning weight and the giving of good reason for less weight assigned to Dr. Palfreyman's opinions.

## VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. Section 404.1567(b), and, therefore, she could perform jobs that exist in significant numbers in the national economy. Hence, in conclusion, she is not entitled to DIB and SSI.

Dated: December 30, 2015             */s/George J. Limbert*
                                                   GEORGE J. LIMBERT
                                                   UNITED STATES MAGISTRATE JUDGE